**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE DAILY CALLER NEWS FOUNDATION and RICHARD POLLOCK,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF STATE,<br><br>Defendant. | Civil Docket No. 15-cv-1979 (RJL) |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiffs The Daily Caller News Foundation and Richard Pollack submitted to Defendant United States Department of State ("State") a request for records under the Freedom of Information Act ("FOIA") pertaining to trainings taken and briefings received by five former State officials on the handling of classified materials and communications through secure equipment. State searched for records responsive to Plaintiffs' request and released all responsive, non-exempt material, including twelve documents in full and fifty-seven documents in part. As discussed in this memorandum and the attached declarations, State searched all locations likely to contain relevant documents and thus satisfied its burden under the FOIA. State also properly withheld information that is specifically exempted from disclosure by statute pursuant to FOIA Exemption 3, 5 U.S.C. § 552(b)(3). Accordingly, the Court should grant summary judgment in favor of State.

## BACKGROUND

### I. Plaintiffs' Original FOIA Request

On October 9, 2015, Plaintiffs submitted a FOIA request to State seeking

- "[r]ecords memorializing certification that senior State officials had satisfactorily completed mandatory security training courses regarding the handling of classified materials and communications through secure equipment; and
- [r]ecords memorializing certification that senior State officials had satisfactorily completed mandatory Information Technology training courses regarding the handling of classified materials and communications through secure equipment."

Answer Ex. A. Plaintiffs further stated that the senior State officials encompassed in their FOIA request included only former Secretary of State Hillary Clinton, former Under Secretary Patrick F. Kennedy, Cheryl Mills, Huma Abedin, and Jacob Sullivan. *Id*. The timeframe for Plaintiffs' request was January 1, 2009, through February 28, 2013. *Id*. State acknowledged receipt of the FOIA request by letter dated October 22, 2015, and assigned it the Case Control Number F-2015-15449. *See* First Stein Decl. ¶ 5.

In response to this request, State initiated searches at the Foreign Service Institute ("FSI"), the Bureau of Diplomatic Security ("DS"), and the Bureau of Information Resource Management ("IRM")—the same offices suggested by Plaintiffs in their FOIA request.[1] *Id*. ¶ 10; *see also* Answer Ex. A. At FSI, a management analyst searched State's Student Management Training System, which contains records of all official training activity undertaken by State employees, and the Cyber Security Administration database, which contains records of all online training activity related to State's cyber security awareness course, PS800. Sec. Stein Decl. ¶ 4.

[1] Plaintiffs suggested in their FOIA request that responsive records might also be found in the "Office of Security." Compl. ¶ 8. No such office exists at State. *See* First Stein Decl. ¶ 10. State thus interpreted Plaintiffs to be suggesting that responsive records might reside at DS, which State had already identified as an office to be searched. *See id.*

At DS, State searched the office's electronic and paper files, including records of Cyber Security Awareness trainings, electronic training records for Sensitive Compartmented Information ("SCI"), records of SCI briefings, and Form SF-312s.[2] *Id.* ¶ 6. IRM did not maintain the types of training records requested by Plaintiffs. First Stein Decl. ¶ 14. Following those searches, State released three documents in full to Plaintiffs on February 19, 2016, and four documents in full and four documents in part on March 21, 2016. *Id.* ¶¶ 12, 18.

## II. State's First Motion for Summary Judgment

State moved for summary judgment on June 3, 2016, arguing that it conducted an adequate search. *See* Mem. of P. & A. in Support of Def.'s Mot. for Summ. J. at 1, ECF No. 12. Plaintiffs opposed State's motion on the grounds that State should have searched "individual-specific hard drives and/or shared drives utilized by any of the specific senior State officials during their respective tenures at State." Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5, ECF No. 13. Plaintiffs also filed a cross-motion for discovery, contending that the Court should order limited discovery to address the alleged deficiencies in State's search. *See* Cross-Mot. for Disc. at 3, ECF No. 14.

The Court held a hearing on the parties' motions on August 31, 2016. During the hearing, State agreed to conduct supplemental searches for other records sought by Plaintiffs. *See* Third Stein Decl. ¶ 3. The Court later denied both parties' motions as moot. Mem. Order at 1, ECF No. 21.

[2] "The form SF-312 is a legally bound agreement between an individual and the United States, where the individual accepts the responsibility of properly maintaining classified information, in consideration of being granted access to classified information." Sec. Stein Decl. at 4 n.2.

## III. Plaintiffs' Revised FOIA Request

Plaintiffs' revised request was for "documentation memorializing training that satisfied the annual mandatory security [requirements regarding the handling of classified materials and communications through secure equipment] and IT training requirements [regarding the handling of classified materials and communications through secure equipment] (as obligated in the Foreign Affairs Manual)," including "verbal briefings," "in person orientations," and "any other type of briefing that was meant to serve as the equivalent of logging into the formal agency software program and completing the training through that standard mechanism." Plaintiffs further specified that this request included the following:

- "[w]ritten outlines, notes, or PowerPoint presentations prepared specifically for any of these individual briefings";
- "documentation identifying specific training materials or source documents that were relied upon during the course of the individual briefings," including "source documents [that] are not otherwise publicly available";
- "[d]ocumentation that served as the equivalent of the formal training certificate confirming that the individual had completed their mandatory training (whether for security or IT) for the year"; and
- "[i]dentification of the name and position title of each briefer who handled each individual briefing for any of the five specific State officials."

The Court held a status conference to discuss State's supplemental searches on September 15, 2016. Following the hearing, the Court issued a Minute Order requiring State to provide a full report of its supplemental search results to Plaintiffs by close of business the following day.[3] To clarify their request, counsel for Plaintiffs sent counsel for State the description below:

[3] The Court's Minute Order set September 15, 2016, as the deadline by which State was to provide this report to counsel for Plaintiffs. However, counsel for State confirmed in writing with counsel for Plaintiffs that, based on statements made by the Court at the September 15

- "all the paperwork (minus publicly available Government source materials) that was relied upon by the briefer(s) to train Secretary Clinton and the four officials in each of the in person orientation briefings," and

- "paperwork . . . documenting that the training itself had occurred."

On September 16, 2016, based on information provided by State, counsel for State informed counsel for Plaintiffs that State's supplemental searches had identified approximately 1,000 potentially responsive documents. Status Report ¶ 3, ECF No. 26. Counsel for State noted that approximately 600 of those documents were classified due to their association with Special Security Reporting Programs ("SSRPs"), and that the individuals at State who process FOIA requests did not possess the necessary clearances to review those documents, as clearance to review material associated with SSRPs is granted on a program-by-program basis. *Id.* Of the approximately 400 remaining documents, counsel for State represented that many of them were nondisclosure agreements signed by the State officials identified in Plaintiffs' FOIA request when the officials were granted access to an SSRP. *Id.*

The Court held a second status conference on September 19, 2016, to discuss a production schedule for responsive, non-exempt records identified through State's supplemental searches. At that hearing, counsel for State referred to the "approximately 600 documents that are classified, highly classified, Top Secret, or . . . higher than Top Secret." Transcript at 7. Following the hearing, the Court issued an order requiring State to produce all non-exempt portions of documents responsive to Plaintiffs' revised requests on September 26, October 3, and October 10, 2016. Mem. Order at 2, ECF No. 21. The order "specifically *exclude[d]* the approximately 600 classified documents." *Id.* (emphasis in original).

---

hearing, the parties' mutual understanding was that State's report was due to Plaintiffs by close of business on September 16, 2016.

On September 26, 2016, State produced to Plaintiffs twelve records in part. Third Stein Decl. ¶ 3. On October 3, 2016, State produced to Plaintiffs one record in full and thirty-four records in part. *Id.* ¶ 4. Finally, on October 7, 2016, State produced to Plaintiffs seven records in part. *Id.* ¶ 5.

After this production was complete, on December 4, 2016, counsel for Plaintiffs contacted counsel for State, inquiring about the status of the approximately 600 classified documents that had been excluded from the Court's prior order. Status Report ¶ 6, ECF No. 26. During State's follow-up efforts to process these documents, agency counsel and counsel for State learned that the office responsible for managing SSRPs, the Special Security Operations Division ("SSOD") in DS, had not in fact identified approximately 600 potentially responsive classified documents associated with those programs. *Id.* Rather, SSOD had identified approximately 600 *SSRPs*, not documents, associated with nondisclosure agreements.[4] *Id.* To correct the erroneous information submitted to the Court, State filed a status report on January 12, 2017, providing information regarding the miscommunication that had occurred.[5] In that status report, State also noted that SSOD had conducted a search of its records and identified no responsive documents associated with the approximately 600 SSRPs, other than the nondisclosure agreements that State had already produced. *Id.* Accordingly, State had completed its processing of documents identified through its supplemental searches—it had

---

[4] Some of those nondisclosure agreements, which were identified in the course of State's supplemental searches, had been determined to be responsive to Plaintiffs' revised request and were thus produced to Plaintiffs on the September and October 2016 production dates. Status Report ¶ 6.

[5] A further explanation of the miscommunication that occurred is provided in the attached declaration from Joseph Giardino and *infra* in this memorandum.

produced all responsive, nonexempt portions of the approximately 400 documents identified through those searches, and it had not identified any responsive classified documents. *Id*. ¶ 7.

Finally, on March 1, 2017, State produced to Plaintiffs an additional four documents responsive to their request. Third Stein Decl. ¶ 6. In advance of summary judgment briefing, counsel for Plaintiffs informed counsel for State that Plaintiffs were only challenging the adequacy of State's search and its invocation of FOIA Exemption 3 in withholding certain information.

## STANDARD OF REVIEW

A court reviews an agency's response to a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B). "FOIA cases are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009). In deciding at the summary judgment stage whether an agency has fully discharged its obligations under the FOIA, "the agency must show, viewing the facts in the light most favorable to the requester, that there is no genuine issue of material fact." *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).

## ARGUMENT

### I. State's Search Was Reasonable, Adequate, and Satisfies State's Obligation Under the FOIA

#### A. The Standard for an Adequate Search

The touchstone for determining whether an agency should prevail on a motion for summary judgment in FOIA litigation is whether it demonstrates that its "search for documents was adequate." *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009). An agency's search is adequate if "it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."

*Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The adequacy of a FOIA search is thus gauged "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). In short, "[t]he adequacy of the search . . . is judged by a standard of reasonableness." *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. Dep't. of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 194–95 (D.C. Cir. 2015) ("[A] search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." (quoting *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986))).

"In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith." *Steinberg*, 23 F.3d at 551 (quoting *Weisberg*, 745 F.2d at 1485). Such affidavits are sufficient if they "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)). This standard does not require that "the affidavits of the responding agency set forth with meticulous documentation the details of an epic search for the requested records." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). "Rather, in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice . . . ." *Id.* Moreover, "[s]uch agency affidavits attesting to a reasonable search 'are afforded a presumption of good faith,' and 'can be rebutted only with evidence that the agency's search was not made in good faith.'" *Riccardi v. United*

*States Dep't of Justice*, 32 F. Supp. 3d 59, 63 (D.D.C. 2014) (quoting *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004)).

Finally, courts in this circuit recognize the "well-worn rule . . . that the adequacy of a FOIA search is not to be judged by its results." *Rosenberg v. U.S. Dep't of Immigration & Customs Enf't*, 13 F. Supp. 3d 92, 104 (D.D.C. 2014). "The question is not 'whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.'" *Steinberg*, 23 F.3d at 551 (quoting *Weisberg*, 745 F.2d at 1485) (emphases in original). Thus, courts have rejected challenges to the adequacy of a search, even when a "slim yield may be intuitively unlikely" and a "reasonable observer would find th[e] result[s] unexpected." *Ancient Coin Collectors Guild*, 641 F.3d at 514. Moreover, "mere speculation that as yet uncovered documents might exist[] does not undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur v. C.I.A.*, 355 F.3d 675, 678 (D.C. Cir. 2004); *see also Sheffield v. Holder*, 951 F. Supp. 2d 98, 101 (D.D.C. 2013) (noting that a requester "cannot rest . . . on mere conjecture or 'purely speculative claims about the existence and discoverability of other documents'" (quoting *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 107 (D.D.C. 2005))).

**B. State's Initial Searches**

As set forth in the attached declarations, State's search satisfied its obligations under the FOIA because it demonstrated a good faith effort to search for the requested records, using methods that were reasonably expected to produce the information requested, and State searched all locations likely to contain responsive records. Plaintiffs' first formulation of their FOIA request sought records memorializing certification that five former State officials had satisfactorily completed mandatory security and Information Technology training courses

regarding the handling of classified materials and communications through secure equipment. *See* Answer Ex. A. Based on its knowledge of these subjects and its own records systems, State directed its search efforts towards three offices reasonably likely to have responsive records, if any existed: FSI, DS, and IRM. *See* First Stein Decl. ¶ 10.

FSI is State's primary training institute. *Id*. ¶ 11. In response to Plaintiffs' request, State conducted searches of FSI's Student Management Training System, which contains records of all official training activity undertaken by State employees during the relevant time period, and its Cyber Security Administration database, which contains records of all online training activity related to State's cyber security awareness course, PS800, also during the relevant time period. Sec. Stein Decl. ¶ 4. A FSI Management Analyst searched both databases for the employee training profiles of the five State officials named in Plaintiffs' FOIA request using their names as search terms. First Stein Decl. ¶ 12. The analyst also searched the databases using those individuals' unique numeric identifiers. *Id*.

DS is responsible for providing a safe and secure environment for the conduct of United States foreign policy. *Id*. ¶ 15. An analyst at DS's Freedom of Information and Privacy Act Office, which reviews all incoming FOIA requests, concluded that the only DS component reasonably likely to maintain responsive records was the Security Infrastructure Directorate ("DS/SI"). *Id*. DS/SI is "the backbone of information security" for State. *Id*. ¶ 16. In addition to FSI, DS/SI maintains electronic records of the cyber security awareness course, PS800. Sec. Stein Decl. ¶ 6. The office also has access to SCI electronic training records, including those from the relevant time period, and maintains records of SF-312 forms and SCI briefings.[6] *Id*. The Special Assistant for DS/SI coordinated searches of DS/SI's records for documents

[6] These constitute records of briefings conducted by DS officials. *See* Sec. Stein Decl. at 4 n.3.

responsive to Plaintiffs' FOIA request, either manually or, in the case of electronic records, using the names of the five State officials as search terms.[7] First Stein Decl. ¶ 17.

IRM is responsible for State's Information Technology services. *Id.* ¶ 13. State learned from the Director of the Office of Governance, Resource, and Performance Management at IRM, who was knowledgeable of Plaintiffs' FOIA request and the responsibilities of the office, that IRM did not maintain the types of training records requested by Plaintiffs. *Id.* ¶ 14.

### C. State's Supplemental Searches

State's supplemental searches for records responsive to Plaintiffs' revised FOIA request also satisfied its obligations under the FOIA. Plaintiffs' revised request sought "documentation memorializing training that satisfied the annual mandatory security [requirements regarding the handling of classified materials and communications through secure equipment] and IT training requirements [regarding the handling of classified materials and communications through secure equipment] (as obligated in the Foreign Affairs Manual)." Such security and IT training requirements, Plaintiffs stated, should include "verbal briefings," "in person orientations," and "any other type of briefing that was meant to serve as the equivalent of logging into the formal agency software program and completing the training through that standard mechanism."

In response to this revised request, State determined that the following State bureaus, offices, collections of materials, and records systems were reasonably likely to contain

[7] In their opposition to State's first motion for summary judgment, Plaintiffs' sole argument challenging the adequacy of State's initial searches was that State had failed to search "individual-specific hard drives and/or shared drives utilized by any of the specific senior State officials" on the chance that they might contain "courtesy cop[ies] of . . . certifications" showing that the officials had completed security and Information Technology training courses. Mem. in Opp. to Def.'s Mot. for Summ. J. at 5, ECF No. 13. Plaintiffs are incorrect for the reasons articulated in State's Reply in Support of Its Motion for Summary Judgment, ECF No. 16. However, even if Plaintiffs were correct—and they are not—State has since searched those individual hard drives and shared drives, as detailed *infra*. *See also* Third Stein. Decl. ¶¶ 30, 34.

responsive records: DS; the Bureau of Intelligence and Research ("INR"); the Executive Secretariat ("S/ES"); certain electronic files retired by S/ES; the Under Secretary for Management ("M"); materials provided to State by former employees Ms. Abedin, Ms. Mills, and Mr. Sullivan; and materials provided to State by the Federal Bureau of Investigation ("FBI") as a result of its investigation into former Secretary Clinton's use of a personal email server. Third Stein Decl. ¶ 7. These bureaus, offices, collections, and records systems all bear responsibility for and oversight over issues pertaining to the protection of classified information, cybersecurity, and Information Technology at State, or they house records relating to the five former State officials identified in Plaintiffs' FOIA request. They were thus the logical places to look for records responsive to Plaintiffs' revised request.

**i. DS**

The Chief of DS's Freedom of Information and Privacy Act Office determined that the DS components reasonably likely to have records responsive to Plaintiffs' revised request were DS's Front Office, its Freedom of Information and Privacy Act Office, and its Security Infrastructure Directorate. *Id.* ¶ 8. DS's Front Office houses the Assistant Secretary for Diplomatic Security and his immediate staff, and it oversees certain information security issues for State. *Id.* ¶ 9. The current Executive Special Assistant in that office, five current Special Assistants, and an Executive Special Assistant who had worked in the DS Front Office during the time period covered by Plaintiffs' request, each of whom were knowledgeable of the office's records systems and Plaintiffs' request, searched their classified and unclassified e-mail records and the office's classified and unclassified shared drives[8] for records responsive to Plaintiffs'

---

[8] A shared drive is an electronic collection of folders stored on a local network. Third Stein Decl. at 4 n.3.

revised request. More specifically, they searched these record systems for any documents containing the names "Hillary Clinton," "Patrick F. Kennedy," "Cheryl Mills," "Huma Abedin," or "Jacob Sullivan," in combination with each of the following terms: "training," "briefings," "cyber," "PS800,"[9] "indoctrination," "312,"[10] "security," or "orientation." *Id*. In conducting those searches, the current Executive Special Assistant and five Special Assistants applied no date range restriction to their searches, and the former Executive Special Assistant limited her search to the timeframe in which she had worked in the Front Office. *Id*.

At DS's Freedom of Information and Privacy Act Division, which processes all information access law requests directed to DS and oversees the Records Management Program for DS, State searched the email records of the former Assistant Secretary for DS, Eric Boswell, for the time period 2009 through 2012. *Id*. ¶ 10. The Division Chief of the office also searched the office's classified and unclassified shared drives, which house documents that were responsive to past FOIA requests and whose subject matter overlapped with Plaintiffs' request in this case. *Id*. These electronic records were searched for any documents containing the names "Hillary Clinton," "Patrick F. Kennedy," "Cheryl Mills," "Huma Abedin," or "Jacob Sullivan," in combination with each of the following terms: "S," "training," "briefings," "cyber," "PS800," "indoctrination," "312," "security," or "orientation." *Id*.

Finally, State conducted searches in DS's Security Infrastructure Directorate ("DS/SI"), which serves as the backbone of security to support the current and emerging needs of State. *Id*.

---

[9] "PS800" is the code for State's course entitled "Cyber Security Awareness." Third Stein Decl. at 4 n.3. Records of that course are maintained electronically by DS/SI and FSI. Sec. Stein Decl. ¶ 6.

[10] This search term was used at DS's Front Office, as well as other offices identified below, to locate copies of SF-312 forms, which DS also searched for in State's initial searches. *See id*. at 4 n.5.

¶ 11. The three components that comprise DS/SI—the Office of Cybersecurity, the Office of Personnel Security and Suitability, and the Office of Information Security—all have responsibilities pertaining to cyber security and information security. *Id.* ¶¶ 11–14. Within DS/SI itself, the office's Director and a Special Assistant, who were each knowledgeable of the office's records systems and Plaintiffs' FOIA request, conducted a search of that office's electronic files, including the Director's and the Special Assistant's classified and unclassified email records and the classified and unclassified office shared drives, for any documents containing the names "Hillary Clinton," "Patrick F. Kennedy," "Cheryl Mills," "Huma Abedin," or "Jacob Sullivan," in combination with each of the following terms: "S," "training," "briefings," "cyber," "PS800," "indoctrination," "312," "security," or "orientation." *Id.* ¶ 11. No date range was applied for this search. *Id.*

At DS/SI's Office of Cybersecurity, which ensures security for State's global information and information assets, the director of the office, who was knowledgeable of the office's records systems and the subject of Plaintiffs' request, coordinated searches of the office's unclassified and classified electronic files, including the office shared drives and the classified and unclassified email records of the Director and the Branch Chief of the Cyber Threat Analysis Division. *Id.* ¶ 12. The electronic files were searched for any documents containing the names "Hillary Clinton," "Patrick F. Kennedy," "Cheryl Mills," "Huma Abedin," or "Jacob Sullivan," in combination with each of the following terms: "S," "training," "briefings," "cyber," "PS800," "indoctrination," "312," "security," or "orientation." *Id.* No date range was applied for this search. *Id.*

At DS/SI's Office of Personnel Security and Suitability, which manages State's personnel security clearance program, a Government Information Specialist manually searched the

hardcopy security background files for former Secretary Clinton, former Under Secretary Kennedy, Ms. Mills, Ms. Abedin, and Mr. Sullivan for any documents responsive to the subject FOIA request. *Id.* ¶ 13.

DS/SI's Office of Information Security ensures the protection of and trusted access to national security information and Sensitive but Unclassified information. *Id.* ¶ 14. Within that office is the Special Security Operations Division ("SSOD"), which ensures the security integrity of personnel requesting access to SCI by conducting access indoctrination and training in the proper handling of Sensitive Compartmented Information ("SCI") material. *Id.* ¶ 15. The Chief of the SSOD, who was knowledgeable of the office's records systems and Plaintiffs' request, coordinated searches of the unclassified, classified, and SCI email records of all employees in that office, including his own, as well as the office's shared drives for any documents containing the names "Hillary Clinton," "Patrick F. Kennedy," "Cheryl Mills," "Huma Abedin," or "Jacob Sullivan," for the time period relevant to the request. *Id.* ¶ 16. The Chief also coordinated a manual search of the office's hardcopy files for former Secretary Clinton, former Under Secretary Kennedy, Ms. Mills, Ms. Abedin, and Mr. Sullivan for any documents responsive to the subject FOIA request. *Id.*

The error that State previously reported to Plaintiffs and the Court regarding the miscommunication about the results of DS/SI's Office of Information Security's search does not affect the adequacy of that search. *See* Status Report, ECF No. 26. As the attached declaration from the Chief of the SSOD, Joseph Giardino ("Giardino Declaration"), explains, in response to the Court's order requiring State to provide Plaintiffs with a full report of State's supplemental search results by close of business on September 16, 2016, Mr. Giardino was asked to provide the approximate number of (1) nondisclosure agreements located by the office that were signed

by any of the five State officials identified in Plaintiffs' request following in-person briefings, and (2) documents from those briefings. Giardino Decl. ¶ 5. Mr. Giardino told an attorney at State that the office had located approximately thirty nondisclosure agreements and approximately 600 classified documents. *Id*. In doing so, Mr. Giardino inadvertently conveyed that the office had identified approximately 600 potentially responsive classified *records*, when in reality, the office had located approximately 600 *SSRPs* associated with nondisclosure agreements signed by the five State officials. *Id*. ¶ 6.

Mr. Giardino further explains that when an individual receives an indoctrination briefing regarding how to properly handle information received through a particular SSRP, a process referred to as an individual being "read into" an SSRP, it is common for employees in his office, including himself, to refer to that individual as having been "read into the document," as opposed to the program. *Id*. ¶ 6. Thus, for example, if a person signs a nondisclosure agreement reflecting that he or she was read into three SSRPs, Mr. Giardino would generally refer to that person as having been "read into three documents." *Id*. Mr. Giardino was unaware, however, that the State Department attorney with whom he was communicating on this case was unfamiliar with this usage convention when he conveyed the above information to the attorney, thereby inadvertently creating the confusion about the existence of responsive records. *Id*.

The SSOD has since conducted a search of its paper records, the only form in which the office keeps classified material associated with SSRPs, and has confirmed that it maintains no classified records associated with the programs on which the five State officials might have been briefed during the relevant time period. *Id.* ¶ 8.

Also within DS/SI's Office of Information Security is the Program Applications Division, which is responsible for the development, coordination, training, and implementation of plans,

policies, and procedures necessary to safeguard State's global assets, personnel, information, and property, and whose instructors train State employees and contractors on the basics of protecting classified national security information. Third Stein Decl. ¶ 17. The office's Division Chief, who was knowledgeable of the office's records systems and Plaintiffs' request, searched his personal hardcopy folder, where copies of documents pertaining to new administration VIPs are maintained, for any responsive records. *Id.* He also searched his electronic files, including his unclassified email records and a Microsoft Access database used by State to keep a master record of SF-312s briefing dates for all cleared employees, for any documents containing the names "Hillary Clinton," "Patrick F. Kennedy," "Cheryl Mills," "Huma Abedin," or "Jacob Sullivan," in combination with the term "SF-312." *Id.* No date range was applied for this search. *Id.*

**ii. INR**

INR harnesses intelligence to serve U.S. diplomacy and serves as the focal point at State for ensuring policy review of sensitive counterintelligence and law enforcement activities around the world. *Id.* ¶ 19. The Deputy Assistant Secretary for INR, who was knowledgeable of INR's records systems and Plaintiffs' request, determined that two INR components were reasonably likely to contain responsive records: the Office of Intelligence Operations and Oversight and the Office of Technical Collection Affairs. *Id.* Both of these offices conduct indoctrination briefings for access to SCI or Special Access Programs for State employees and maintain nondisclosure agreements signed by State employees after they receive such briefings. *Id.* ¶¶ 20, 21.

The Director of the Office of Intelligence Operations and Oversight, who was knowledgeable of that office's records systems and Plaintiffs' request, searched the office's paper files for nondisclosure agreements, which are not maintained electronically, for former

Secretary Clinton, former Under Secretary Kennedy, Ms. Mills, Ms. Abedin, and Mr. Sullivan. *Id.* ¶ 20. Similarly, a Special Assistant in the Office of Technical Collection Affairs, who was knowledgeable of that office's records systems and Plaintiffs' request, searched by name that office's classified shared folder where the nondisclosure agreements pertaining to former Secretary Clinton, former Under Secretary Kennedy, Ms. Mills, Ms. Abedin, and Mr. Sullivan are maintained. *Id.* ¶ 21. In addition, the paper records of the same nondisclosure agreements were also searched. *Id.*

**iii. S/ES**

S/ES coordinates the work of State internally and serves as the liaison between State's bureaus and the offices of the Secretary, the Deputy Secretary, and the Under Secretaries. *Id.* ¶ 23. An S/ES Government Information Specialist, who was knowledgeable of both that office's records systems and the subject matter of Plaintiffs' request, searched the approximately 55,000 pages of emails that former Secretary Clinton provided to State in December 2014, as well as the unclassified and classified state.gov e-mail records of Mr. Sullivan, Ms. Abedin, Ms. Mills, the former Director of the Office of Information Resource Management for the Executive Secretariat, and three of four former Bureau Security Officers[11] ("BSO") who worked in the Executive Office for the Executive Secretariat during the time period relevant to Plaintiffs' request. *Id.* ¶ 24. The S/ES Government Information Specialist used the search terms "Security Training," "IT Training," "PK 323,"[12] "Proper classification marking," "PS 800," "Cyber Security Awareness," "Cyber Security," "Verbal Briefing," "verbal," and "orientation," and

---

[11] BSOs are responsible for providing security services for S/ES, including the handling and storage of classified material, cyber security, and security technology. Third Stein Decl. at 8 n.7

[12] PK323 is the course code for State's course entitled "Classified and Sensitive But Unclassified Information: Identifying and Marking." *Id.* at 11 n.8.

applied the date range of January 8, 2008 through February 28, 2013. *Id.* The fourth former BSO who had worked in the Executive Office for the Executive Secretariat during the time period relevant to Plaintiffs' request searched his own unclassified e-mails records using the following terms: "Cheryl Mills briefing," "Huma Abedin briefing," "Jake Sullivan briefing," "Jacob Sullivan briefing," "Pat Kennedy briefing," and "Patrick Kennedy briefing" for the time period in which he was employed as a BSO in that office. *Id.* ¶ 25.

In addition, searches were conducted at three offices within S/ES. The Office of Information Resource Management for the Executive Secretariat is responsible for providing information technology services to S/ES. *Id.* ¶ 26. That office's Branch Chief and Team Leader, both of whom were familiar with the office's records systems and Plaintiffs' request, searched their unclassified and classified email records, as well as the office's shared drive and SharePoint site (a web-based document management system), using the following terms: "Security Training," "IT Training," "PK 323," "Proper classification marking," "PS 800," "Cyber Security Awareness," "Cyber Security," "Verbal Briefing," "verbal," and "orientation." *Id.* The time period searched was January 8, 2008, through February 28, 2013. *Id.*

The Executive Office for the Executive Secretariat ("S/ES-EX") provides security, administrative, and logistical services to the Secretary, Deputy Secretaries and Under Secretaries, S/ES, and Special Offices under the auspices of the Office of the Secretary. *Id.* ¶ 27. The Director of that office coordinated a search of the office's shared drive using the search terms "Security Training," "IT Training," "PK 323," "Proper classification marking," "PS 800," "Cyber Security Awareness," "Cyber Security," "Verbal Briefing," "verbal," and "orientation," for the time period of January 8, 2008, through February 28, 2013. *Id.*

Finally, the Bureau Security Office at S/ES provides security services, including the handling and storage of classified material, cyber security, and security technology. *Id.* ¶ 28. Two currently serving BSOs, who were knowledgeable of both the office's records systems and the subject matter of Plaintiffs' request, searched their emails, paper files, and the office's electronic files, which consist of an SCI Access Database and the office's shared drive. *Id.* The BSOs searched their unclassified and classified email accounts, paper records, and the office shared drive using the following terms: "Security Briefing," "Security Indoctrination," "Security Training," and "Security Bulletin." *Id*. The time period searched was January 8, 2008, through February 28, 2013.[13] *Id*. The SCI Access Database was searched using the names of the five former State officials. *Id.*

**iv. S/ES Retired Electronic Files**

A Government Information Specialist at State's Office of Information Programs and Services ("IPS"), who was knowledgeable of both Plaintiffs' request and the relevant records systems, conducted a search of electronic records retired by the Executive Secretariat Staff. *Id.* ¶ 30. These consist of the office shared drive that was available to employees within the Office of the Secretary during former Secretary Clinton's tenure; unclassified individual electronic drives belonging to Ms. Mills, Ms. Abedin, and Mr. Sullivan; and classified individual electronic drives belonging to Ms. Mills and Mr. Sullivan. *Id*. The IPS Government Information Specialist conducted a full-text search of these S/ES retired electronic files using the search terms "Security Training," "IT training," "PK323," "Proper Classification markings," "PS800," "Cyber Security Awareness," "cyber security," or "verbal briefing." *Id.*

[13] State was unable to search the e-mail records of one of the BSOs for the time period January 31, 2013, through February 28, 2013. Third Stein Decl. at 13 n.9

**v. M**

M oversees the activities of ten bureaus and offices, including those responsible for security, State's information technology infrastructure, and personnel training. *Id.* ¶ 32. An M Senior Advisor, who was knowledgeable of both the FOIA request at issue and M's records systems, conducted a search of M's paper records for any documents responsive to the subject FOIA request. *Id.* ¶ 33. An S/ES Government Information Specialist also searched former Under Secretary Kennedy's unclassified and classified email records, unclassified and classified individual electronic drive, and the unclassified and classified shared drive to which he had access during his term as Under Secretary for the time period January 8, 2008, through February 28, 2013, using the search terms "Security Training," "IT Training," "PK 323," "Proper classification marking," "PS 800," "Cyber Security Awareness," "cyber security," "verbal briefing," and "orientation." *Id.* ¶ 34.

**vi. Records Provided to State by Ms. Abedin, Ms. Mills, and Mr. Sullivan**

Following letters sent by State to Ms. Abedin, Ms. Mills, and Mr. Sullivan requesting that they provide federal records in their possession concerning official government business sent or received on a personal email account while serving in their official capacity at State, all three individuals submitted documents that State searched in response to Plaintiffs' revised FOIA request. *Id.* ¶ 36. A Government Information Specialist at IPS, who was knowledgeable of both Plaintiffs' request, relevant records systems, and collections of materials, conducted a full-text search of the materials provided by Ms. Abedin, Ms. Mills, and Mr. Sullivan using the search terms "Security Training," "IT training," "PK323," "Proper Classification markings," "PS800," "Cyber Security Awareness," "Cyber security," or "verbal briefing." *Id.*

**vii. Materials Provided to State by the Federal Bureau of Investigation**

In response to a letter sent by State on July 8, 2016, requesting that the Federal Bureau of Investigation ("FBI") provide State with any additional work-related emails of former Secretary Clinton that the FBI had retrieved during the course of its investigation, the FBI transferred to State certain information that the FBI stated might include agency records of State. *Id.* ¶ 38. A Government Information Specialist at IPS, who was knowledgeable of Plaintiffs' request, conducted a search of these records using the following search terms: "Security Training," "IT training," "PK323," "Proper Classification markings," "PS800," "Cyber Security Awareness," "cyber security," or "verbal briefing." *Id.* ¶ 39.

**viii. Search of Materials Retrieved in Response to Other FOIA Requests in Litigation**

The Chief of the Programs and Policies Division at IPS, based upon her knowledge of Plaintiffs' request and documents that had previously been produced in other FOIA cases, directed an IPS Government Information Specialist to retrieve the SF-312 forms for Ms. Mills, Ms. Abedin, and former Secretary Clinton, which had been previously produced in response to another FOIA request from IPS's document management system known as FREEDOMS 2. *Id.* ¶ 41.

*****

As this record demonstrates, State's search spanned four of its bureaus, numerous components within those bureaus, the office of one Under Secretary, and multiple records systems and custodians in an effort to locate records responsive to Plaintiffs' original FOIA request and their revised FOIA request. State's efforts evince "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," and State has "aver[ed] that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68; *see also* Third Stein

Decl. ¶ 44. State thus conducted an adequate search and has satisfied its obligations under the FOIA.

## II. State Properly Withheld Information Pursuant to FOIA Exemption 3

State also properly withheld pursuant to FOIA Exemption 3 certain information pertaining to SCI to which four of the five State officials had been granted access, as that information was protected from disclosure under Section 102A(i)(1) of the National Security Act of 1947, codified at 50 U.S.C. § 3024(i)(1). *See Vaughn* Index at 1–3.

Under FOIA Exemption 3, information that is specifically exempted from disclosure by a statute enacted prior to 2009 need not be disclosed, so long as (1) the statute requires that such matters be withheld from the public in such a manner as to leave no discretion on the issue, or (2) establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3); *see also Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 617–18 (D.C. Cir. 2011) (noting that FOIA Exemption 3 "incorporate[es] the protections of other shield statutes"). Thus, courts assessing a withholding made pursuant to FOIA Exemption 3 engage in a two-prong review: "First, is the statute in question a statute of exemption as contemplated by exemption 3? Second, does the withheld material satisfy the criteria of the exemption statute?" *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 761 (D.C. Cir. 1990) (citation omitted); *see also Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (noting that under FOIA Exemption 3, an agency "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute").

State's withholdings under FOIA Exemption 3 satisfy both requirements. First, as the D.C. Circuit has noted, "[c]ourts have held that [50 U.S.C. § 3024(i)(1)], which calls for the

Director of National Intelligence to protect 'intelligence sources and methods from unauthorized disclosure,' is a valid Exemption 3 statute." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting 50 U.S.C. § 3024(i)(1)); *see also id*. at 197 (noting that the requestor "[did] not dispute, nor could she, that Section 3024(i)(1) is a valid Exemption 3 statute"); *Nat'l Sec. Counselors v. Cent. Intelligence Agency*, No. CV 12-284 (BAH), 2016 WL 6684182, at *22 (D.D.C. Nov. 14, 2016) (noting that the Supreme Court has held that 50 U.S.C. § 3024(i) is a withholding statute for purposes of FOIA Exemption 3).

Second, the information redacted by State satisfies § 3024(i)'s criteria for withholding—namely, "do [the withholdings] in fact 'protect intelligence sources and methods'?" *Leopold v. Cent. Intelligence Agency*, 106 F. Supp. 3d 51, 57 (D.D.C. 2015). "The D.C. Circuit has interpreted this provision broadly, holding that material is properly withheld under the Act if it '*relates* to intelligence sources and methods,' or 'can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods.'" *Id*. (quoting *Larson*, 565 F.3d at 865 and *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980)) (emphasis in original). Moreover, "[i]n light of the national security interests implicated by such material, courts give 'even greater deference to [agency] assertions of harm to intelligence sources and methods under the National Security Act.'" *Nat'l Sec. Counselors*, 2016 WL 6684182, at *24 (quoting *Wolf v. CIA*, 473 F.3d 370, 377 (D.C. Cir. 2007)); *see also Leopold*, 106 F. Supp. 3d at 58 (noting in the context of § 3024(i) that "[t]he Supreme Court has also warned that 'it is the responsibility of the [intelligence community], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process" (quoting *C.I.A. v. Sims*, 471 U.S. 159, 180 (1985))). Accordingly, the National Security Act, when invoked in the context of Exemption 3,

"includes the 'power to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source [or method].'" *Leopold*, 106 F. Supp. 3d at 57–58 (quoting *Sims*, 471 U.S. at 178) (alteration in original). "This is so because in the intelligence context 'bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'" *Id.* at 58 (quoting *Sims*, 471 U.S. at 178).

As explained in State's *Vaughn* index, release of the information that State withheld pursuant to FOIA Exemption 3 could indeed be reasonably expected to reveal intelligence sources and methods and therefore is exempt from disclosure. In thirty-five SCI nondisclosure agreements[14] that State produced to Plaintiffs in part—seven signed by former Secretary Clinton, nine signed by Ms. Mills, fifteen signed by Mr. Sullivan, and four signed by former Under Secretary Kennedy—State withheld information regarding particular SCI programs to which each of those individuals had been granted access. *Vaughn* Index at 1–3. Specifically, the withheld information pertains to and would demonstrate the naming conventions applied by the United States intelligence community to those programs. *Id.*

Disclosure of these naming conventions would reveal how SCI is gathered and organized by the United States intelligence community in the context of these programs and their respective subject matters. *Id.* Courts have upheld such withholdings pursuant to FOIA Exemption 3 and § 3024(i) when the information "[might] be indicative of certain methods by which the agency collects intelligence," could "reveal[] the means by which it protects classified information [and]

---

[14] These nondisclosure agreements constitute legally binding agreements between the signatory and the United States wherein the signatory accepts the responsibility of properly maintaining classified information in consideration of being granted access to that information. *Vaughn* Index at 1 n.2.

expose intelligence sources and methods," or could shed light on the "means by which the [agency] protects its classified equities." *Nat'l Sec. Counselors v. Cent. Intelligence Agency*, No. CV 11-443, 2016 WL 4621060, at *19–*20. All three are true of the withholdings challenged by Plaintiffs, as the information pertaining to naming conventions for SCI programs that State redacted under the National Security Act relates to intelligence methods for collecting and systematizing SCI. *Cf. Looks Filmproduktionen GmbH v. Cent. Intelligence Agency*, No. CV 14-1163 (BAH), 2016 WL 4186652, at *14 (D.D.C. Aug. 5, 2016) (upholding the CIA's withholding of classification and dissemination-control markings used to indicate the levels of classification and procedures for restricting the dissemination of sensitive information because it could lead to the unauthorized disclosure of intelligence sources and methods); *Larson v. Dep't of State*, No. 02–1937, 2005 WL 3276303, at *11 (D.D.C. Aug. 10, 2005) (same); *Shaw v. U.S. Dep't of State*, 559 F. Supp. 1053, 1066 (D.D.C. 1983) (same with regard to information markings and cryptonyms).

### III. State Produced All Reasonably Segregable Information

State has released to Plaintiffs all reasonably segregable, non-exempt information. *See* Third Stein Decl. ¶ 44. FOIA requires that, if a record contains information that is exempt from disclosure, any reasonably segregable information must be disclosed after deletion of the exempt information, 5 U.S.C. § 552(b), unless the non-exempt portions are "inextricably intertwined with exempt portions," *Mead Data Ctr. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977); *see also Kurdyukov v. U.S. Coast Guard*, 578 F. Supp. 2d 114, 128 (D.D.C. 2008). However, this does not require the disclosure of records in which the non-exempt information that remains is meaningless. *See Nat'l Sec. Archive Fund v. CIA*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (concluding that no reasonably segregable information existed because "the non-

exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words”).

Consistent with this obligation, State has carefully reviewed all documents identified as responsive to Plaintiffs’ request for reasonable segregation of non-exempt information and has implemented segregation when possible, as demonstrated by its production of many partially redacted documents. Third Stein Decl. ¶ 44. State has thus concluded that there is no additional non-exempt information that may reasonably be segregated and released without disclosing information warranting protection under the law. *Id*.

## CONCLUSION

For all the foregoing reasons, State respectfully requests that the Court enter summary judgment in its favor.

Dated: March 3, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

/s/ *Jason Lee*
JASON LEE (CA Bar No. 298140)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
Telephone: (202) 514-3367
Fax: (202) 616-8470
Email: Jason.Lee3@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, DC 20044

Courier Address:
20 Massachusetts Ave., NW Rm. 7107
Washington, DC 20001

*Counsel for Defendant*